UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AZTEC ENGINEERING GROUP, INC., | ) | |
| TECNICA Y PROYECTOS S.A., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 1:16-cv-01657-JMS-TAB |
| vs. | ) | |
| | ) | |
| LIBERTY MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
| FIDELITY AND DEPOSIT COMPANY OF | ) | |
| MARYLAND, | ) | |
| XL SPECIALTY INSURANCE COMPANY, | ) | |
| AMERICAN HOME ASSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## **ORDER**

Plaintiffs Aztec Engineering Group, Inc., and Tecnica y Proyectos S.A. (collectively, "Aztec-TYPSA") have filed a claim on a Payment Bond issued by Defendants Liberty Mutual Insurance Company, Fidelity and Deposit Company of Maryland, XL Specialty Insurance Company, and American Home Assurance Company (collectively, the "Co-Sureties") pursuant to a Public-Private Agreement between the Indiana Finance Authority ("IFA") and I-69 Development Partners LLC (the "Developer") for design and construction work on Section 5 of the I-69 expansion from Bloomington and Martinsville (the "Project"). Aztec-TYPSA seeks payment from the Co-Sureties for design work it did for Isolux-Corsán, LLC ("Isolux-Corsán"),[1] which was the

---

[1] Isolux-Corsán sought to intervene in this litigation to assert a counterclaim against Aztec-TYPSA and seek to stay the litigation to pursue arbitration, [Filing No. 35], but the Court denied that motion, [Filing No. 57]. Isolux-Corsán has appealed that decision, [Filing No. 62], but briefing before the Seventh Circuit Court of Appeals is currently suspended pursuant to Circuit Rule 33. *See* PACER Case Locator, Seventh Circuit Court of Appeals Docket No. 17-1239, *available at* www.pacer.gov (last visited April 17, 2017).

general contractor on the Project. The Co-Sureties denied Aztec-TYPSA's claim. Aztec-TYPSA and the Co-Sureties have filed cross-motions for summary judgment, presenting diametrically opposed interpretations of the contracts at issue but each contending that summary judgment is appropriate for the reasons stated therein. [Filing No. 32; Filing No. 47.] For the reasons that follow, the Court enters summary judgment in favor of Aztec-TYPSA and awards it $4,678,451.61 plus prejudgment interest.

## I.
### APPLICABLE STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In

other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-

movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648. Put another way, cross-motions for summary judgment do not waive the right to a trial and, instead, are treated separately. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 (7th Cir. 2008).

## II.
### BACKGROUND

The facts necessary to decide the pending cross-motions for summary judgment are undisputed.[2]

### A. The Project and the Public-Private Agreement

The Project involves upgrading approximately 21 miles of existing State Route 37 through and around Bloomington and Martinsville. [Filing No. 33-1 at 1.] To carry out the Project, the IFA entered into a Public-Private Agreement (the "PPA") with the Developer on April 8, 2014. [Filing No. 33-3 (portions of the PPA); Filing No. 50-4 (the fifty page Abbreviations and

---

[2] Aztec-TYPSA set forth a "Statement of Material Facts Not in Dispute" supporting its request for summary judgment. [Filing No. 33 at 4-12.] In response, the Co-Sureties failed to include a section specifically setting forth any disputed material facts as required by Local Rule 56-1. [Filing No. 48.] Instead, the Co-Sureties included a section titled "Summary of Relevant Facts," which reads like the argument section of a brief. [Filing No. 48 at 6-23.] Aztec-TYPSA also failed to follow the Court's specific guidance for filing and citing exhibits, as set forth in the Practices and Procedures, by not citing to the ECF docket numbers and pages of the exhibits it submitted on summary judgment. [Filing No. 8 at 16-18.] This made the Court's review of the extensive record unnecessarily cumbersome. The Court reminds both parties to review the Local Rules and applicable Practices and Procedures in future cases.

Definitions section of the PPA).][3]  The PPA acknowledges the intention of the State of Indiana "to facilitate private sector investment and participation in the development of the Project via a public-private agreement."   [Filing No. 33-3 (citing Indiana Code Article 8-15.5 ("Public-Private Agreements for Toll Road Projects").]

A section of the PPA titled "Payment and Performance Security" includes a subsection titled "Design and Construction Security Requirements," which provides as follows:

**17.2   Payment and Performance Security**

> **17.2.1   Design and Construction Security Requirements**
>
> 17.2.1.1   As a further condition precedent to commencement of any Construction Work, Developer shall have obtained, delivered to IFA and maintain a separate Payment Bond in an amount equal to five percent (5%) of the Total Project Capital Cost with respect to Construction Work and separate Performance Security in an amount equal to twenty-five percent (25%) of the Total Project Capital Cost, as are required prior to issuance of NTP2 pursuant to Section 5.6.1.1.

[Filing No. 33-3 at 28.]  The PPA defines "Total Project Capital Cost" as follows:

> **Total Project Capital Cost** means the total capital cost for the Project set forth in Exhibit 2-I(2) (Capital Cost Table) to the Agreement.   For purposes of Section 17.2 of the Agreement, the term "Total Project Capital Cost" includes costs associated with both D&C Work and O&M During Construction.

[Filing No. 50-4 at 72.]  The PPA defines "D&C Work," "Design Work," "Construction Work," and "Work" as follows:

---

[3] The portion of the PPA initially designated by Aztec-TYPSA on summary judgment does not include the vast majority of the Abbreviations and Definitions section of that contract. [Filing No. 33-3.]  This significant omission is confusing at best and misleading at worst, given the omission of certain key terms, such as "Construction Work."   [Filing No. 33-3 (including 5 of the 50 pages of the Abbreviations and Definitions section of the PPA).]  The Co-Sureties submitted additional pages of the PPA with their response brief, [Filing No. 47-1 at 18-21], and Aztec-TYPSA finally submitted all fifty pages of the Abbreviations and Definitions section with its reply brief, [Filing No. 50-4].  Because the parties dispute the interpretation and application of various terms in the PPA, Aztec-TYPSA should have designated the entire Abbreviations and Definitions section of that contract with its initial brief.  The record is now complete, however, so the Court will consider the full Abbreviations and Definitions section as necessary.

**D&C Work** means the Design Work and Construction Work, including those obligations of Developer pertaining to design and construction set forth in the Technical Provisions.

\*\*\*

**Design Work** means all Work of design, engineering or architecture for the Project, Project Right of Way acquisition or Utility Adjustments.

\*\*\*

**Construction Work** means all Work to build or construct, reconstruct, rehabilitate, make, form, manufacture, furnish, install, integrate, supply, deliver or equip the Project and/or the Utility Adjustments. Construction Work includes Aesthetics and Landscaping Work and Standard Landscaping and Aesthetics Treatment Work.

\*\*\*

**Work** means the work required to be furnished and provided by Developer under the PPA Documents, including all administrative, design, engineering, real property acquisition and occupant relocation, construction, Aesthetics and Landscaping Work, Rehabilitation Work, Utility Adjustment, utility accommodation, support services, financing services, operations, maintenance and management services, except for those efforts which such PPA Documents expressly specify will be performed by Persons other than Developer-Related Entities.

[Filing No. 50-4 at 16; Filing No. 50-4 at 18; Filing No. 50-4 at 21; Filing No. 50-4 at 75.]

**B. The Design-Build Contract**

On April 8, 2014, the Developer entered into a Design-Build Contract (the "DBC") with an entity that ultimately assigned its obligations to Isolux-Corsán.[4] [Filing No. 33-4 (the DBC); Filing No. 33-1 at 2.] The DBC recognizes that pursuant to the PPA, the "Developer is authorized and has agreed to undertake to design, construct, finance, operate and maintain the Project." [Filing No. 33-4 at 10.] The DBC recognizes that Isolux-Corsán was "selected by IFA to design, construct, finance, operate and maintain the Project." [Filing No. 33-4 at 10.] The DBC contemplates Isolux-Corsán entering into subcontracts with contractors to facilitate the Project.

---

[4] Because there is no dispute that the entity with which the Developer contracted in the DBC assigned its rights to Isolux-Corsán, the Court will refer to Isolux-Corsán as if it were a party to the DBC for the sake of simplicity.

[Filing No. 33-4 at 11.]  The DBC requires Isolux-Corsán—as the "Design-Build Contractor"—to obtain payment security as follows:

**17.2    Payment and Performance Security**

**17.2.1.** <u>Design and Construction Security Requirements</u>. As a further condition precedent to commencement of any Construction Work and O&M During Construction, Design-Build Contractor shall have obtained, delivered to IFA and maintain the Payment Bond and Performance Security required under Section 17.2.1 of the PPA securing Developer's obligations under the PPA, in the same amounts and forms and having the same terms required for the Payment Bond and Performance Security required of Developer by Section 17.2.1 of the PPA, and which shall, at a minimum, remain in full force and effect up to and including (a) with respect to the Payment Bond, Final Acceptance and (b) with respect to the Performance Security, the date that is one year after Substantial Completion. The requirements of Section 17.2.1 of the PPA shall apply to new, reconstructed or rehabilitated improvements during the Term, and any other D&C Work Design-Build Contractor performs for which a bond is required under IC 8-23-9. Prior to commencing any such D&C Work after Final Acceptance, Design-Build Contractor shall obtain IFA's written approval of the form and amount of Payment Bond and Performance Security for such D&C Work pursuant to Section 17.2.1.11 of the PPA.

[Filing No. 33-4 at 15.]  The DBC defines "D&C Work" and "Payment Bond" as follows:

"**D&C Work**" means the Design Work and Construction Work, including those obligations pertaining to design and construction set forth in the Technical Provisions, and all other Work that is made the responsibility of Design-Build Contractor under the Agreement, including O&M During Construction, except as described in <u>Exhibit 28</u> (Developer Responsibilities for D&C Work and O&M During Construction).

\*\*\*

"**Payment Bond**" means one or more payment bonds in place as a condition to issuance of NTP2 and commencement of the D&C Work (including the O&M During Construction), as more particularly set forth in <u>Section 17.2.1</u>.

[Filing No. 50-5 at 4; Filing No. 50-5 at 13.]

### C.  The Payment Bond

On August 20, 2014, the Co-Sureties issued a Payment Bond in the amount of $15,350,000.

[Filing No. 33-5.]  Isolux-Corsán is the "Principal" on the Payment Bond.  [Filing No. 33-5 at 1.]

The Payment Bond acknowledges that it is being executed as "one of the conditions of" the PPA and the DBC, it specifically incorporates the DBC by reference, and it characterizes the DBC as a contract "related to the performance of design and construction work for the Project . . . ." [Filing No. 33-5 at 1.] With regard to its payment obligation, the Payment Bond provides as follows:

> If [Isolux-Corsán] shall comply with all requirements of law and pay, as they become due, all just claims for labor performed and materials and supplies furnished upon or for the work under the [DBC], whether said labor be performed and said materials and supplies be furnished under the original [DBC], any subcontract, or any and all duly authorized modifications thereto, then these presents shall become null and void; otherwise they shall remain in full force and effect.

[Filing No. 33-5 at 1.]

### D. The Engineering Services Agreement

On August 15, 2014, Isolux-Corsán[5] entered into an Engineering Services Agreement (the "ESA") with Aztec-TYPSA "for the performance of professional consulting services in connection with the project and work and services related to the development, construction and operations during Construction Works of 21 miles of what is known as I-69, Section 5." [Filing No. 33-6 at 5.] The ESA identified Aztec-TYPSA as the "Design-Consultant" and specified its "Scope of Services" as follows:

---

[5] As with the DBC, Isolux-Corsán is the assignee of an original party to the ESA, but since there is no dispute that those rights were assigned to Isolux-Corsán, the Court will refer to Isolux-Corsán as if it were a party to the ESA for the sake of simplicity.

**EXHIBIT B**

**SCOPE OF SERVICES**

**B.1. GENERAL**

The Design Consultant shall provide all architectural, design, engineering, , l design, utility design, right-of-way, landscaping design and aesthetic, easement location and traffic management, control, signage, light and device specification services (otherwise collectively defined as "Services" in the Engineering Agreement but understanding that this more expansive definition applies throughout this **Exhibit B**; section and article references in this **Exhibit B**

[Filing No. 33-6 at 105.]

The ESA required Aztec-TYPSA to submit an Application for Payment each month with supporting documentation. [Filing No. 33-6 at 16 (ESA ¶ 6.2).] Within 10 business days, Isolux-Corsán was required to either approve the Application for Payment or issue a written deficiency notice to Aztec-TYPSA setting forth with specificity any items Isolux-Corsán refused to approve. [Filing No. 33-6 at 16 (ESA ¶ 6.2).] Within 60 days of receiving an acceptable Application for Payment, Isolux-Corsán "shall order its paying bank to issue the order of payment for all undisputed amounts plus or minus any adjustments that are mutually agreed upon . . . ." [Filing No. 33-6 at 17 (ESA ¶ 6.3).]

If Isolux-Corsán disputed any items in any Application for Payment, it could withhold payment on the disputed items and pay the remaining amount of the Application for Payment. [Filing No. 33-6 at 17 (ESA ¶ 6.4).] If the parties could not resolve the disputed items, the ESA provided that Isolux-Corsán "shall pay [Aztec-TYPSA] the uncontested amount of the Application for Payment." [Filing No. 33-6 at 17 (ESA ¶ 6.4).] The ESA further provided that Isolux-Corsán "shall be in breach under this [ESA]" if it "fails to make any payment due [Aztec-TYPSA] under this [ESA] when due, provided that such payment is not subject to a Dispute." [Filing No. 33-6 at

[82](#) (ESA ¶ 19.3.1.1).]  The ESA included an arbitration provision requiring Aztec-TYPSA and Isolux-Corsán to arbitrate certain disputes.[6]  [[Filing No. 33-6 at 87](#) (ESA ¶ 19.6).]

### E.  Isolux-Corsán's Non-Payment and Federal Lawsuit

Aztec-TYPSA performed services pursuant to the ESA and submitted Applications for Payment to Isolux-Corsán for those services.  [[Filing No. 33-1 at 3](#).]  Isolux-Corsán "accepted almost all of the invoices, but fully disputed some invoices and partially disputed portions of others."  [[Filing No. 33-1 at 3](#).]  Isolux-Corsán failed to pay some of the undisputed items on the Applications for Payment beginning in April 2015.  [[Filing No. 33-1 at 3](#).]  Aztec-TYPSA issued Notices of Default to Isolux-Corsán pursuant to the ESA for the items Isolux-Corsán had not timely disputed pursuant to the procedure set forth in the ESA.  [[Filing No. 33-1 at 3-4](#) (citing [Filing No. 33-7](#)).]  After continuing to work on the Project and not receiving payment, Aztec-TYPSA stopped working on the Project on June 1, 2016.  [[Filing No. 33-1 at 5](#).]

The total of the items that Aztec-TYPSA submitted to Isolux-Corsán that Isolux-Corsán did not dispute or pay pursuant to the ESA is $4,678,451.61.[7]  [[Filing No. 33-1 at 6](#) (citing [Filing No. 33-10](#)).]  Aztec-TYPSA submitted a Statement to Sureties of Amount Due, [[Filing No. 33-11](#)], but the Co-Sureties have not paid that claim, [*see, e.g.*, [Filing No. 1-13](#); [Filing No. 33 at 12](#).]

---

[6] The Co-Sureties previously asked this Court to compel arbitration on Aztec-TYPSA's claims against the Co-Sureties in this litigation.  [[Filing No. 9](#).]  The Court denied that request after finding that "Aztec-TYPSA's Complaint seeks payment from the Co-Sureties under the Payment Bond for amounts that there is no evidence Isolux-Corsán disputed pursuant to the ESA.  The ESA's arbitration provision cannot be read to encompass a dispute of this nature."  [[Filing No. 30 at 9](#).]

[7] Aztec-TYPSA designates evidence to support this amount.  [[Filing No. 32 at 2](#) (summary judgment request for that amount); [Filing No. 33-1 at 6](#) (affidavit stating that "the undisputed amount owed now totals $4,678,451.61") (citing [Filing No. 33-10](#) ("Summary of Undisputed Corsan Overdue Invoices")).]  While the Co-Sureties dispute that Aztec-TYPSA is entitled to this amount, as set forth more fully below, they do not dispute the proffered amount or designate contrary evidence.

On June 24, 2016, Aztec-TYPSA filed a Complaint against the Co-Sureties in this Court, alleging that the Co-Sureties breached the Payment Bond by not paying the Statement of Amount Due after more than sixty days elapsed. [Filing No. 1 at 9-10.] Aztec-TYPSA and the Co-Sureties have filed Cross-Motions for Summary Judgment, which are now fully briefed and ready for the Court's consideration. [Filing No. 32; Filing No. 47.]

After filing its summary judgment briefs, Aztec-TYPSA filed a Motion for Leave to File Amended Exhibits. [Filing No. 54.] The Co-Sureties do not object to the portion of Aztec-TYPSA's motion asking to substitute an erroneously filed exhibit with the proper exhibit, [Filing No. 55 at 1], but they do object to the extent Aztec-TYPSA uses the motion "to introduce extrinsic evidence to add to, vary/contradict, or explain the clear and unambiguous terms of the Payment Bond and the contracts to which the Payment Bond relates, which the terms of the extrinsic evidence at issue and Indiana's 'four corners' rule bar [Aztec-TYPSA] from doing[,]" [Filing No. 55 at 1]. The Court grants Aztec-TYPSA's Motion for Leave to Amend Exhibits to the extent that its erroneously filed exhibit is stricken,[8] [Filing No. 50-3], but it denies the Motion for Leave to Amend Exhibits to the extent that Aztec-TYPSA tries to belatedly introduce extrinsic evidence to construe the contracts at issue, [Filing No. 54-3].

## III.
### DISCUSSION

Aztec-TYPSA moves for summary judgment on its claim against the Co-Sureties for payment under the Payment Bond because it contends that there is no dispute that Isolux-Corsán is liable for its non-payment of the claims that it did not timely dispute pursuant to the procedure

---

[8] Aztec-TYPSA asks the Court to replace Filing No. 50-3 with Filing No. 54-2, but that is unnecessary because the correct pages of the Payment Bond it asks the Court to consider are already part of the designated evidence on summary judgment, [see Filing No. 33-5].

set forth in the ESA. [Filing No. 33 at 13-23.] In response, the Co-Sureties file a cross-motion for summary judgment and contend that Aztec-TYPSA's design services are not covered by the Payment Bond. [Filing No. 48 at 25-38.] Alternatively, the Co-Sureties argue that even if the Payment Bond covered Aztec-TYPSA's design services, genuine issues of material fact preclude summary judgment in Aztec-TYPSA's favor because of alleged defenses, offsets, set-offs, and counterclaims that Isolux-Corsán may have against Aztec-TYPSA. [Filing No. 48 at 39-47.]

Federal courts deciding state law claims under diversity jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) (citations omitted). If no party raises a choice of law issue to the district court, "the federal court may simply apply the forum state's substantive law." *Id.* Aztec-TYPSA and the Co-Sureties rely on Indiana law in their respective briefs, and the Court will follow suit in its decision.[9]

### A. Payment Bond Coverage for Design Services

In its motion, Aztec-TYPSA anticipates the Co-Sureties' argument that the Payment Bond does not cover the design work that Aztec-TYPSA performed for the Project. Aztec-TYPSA emphasizes that the Payment Bond expressly incorporates the DBC and characterizes the DBC as a contract "related to the performance of *design* and construction work." [Filing No. 33 at 17-19 (citing Filing No. 33-5 at 1 (emphasis added)).] Aztec-TYPSA also emphasizes that the Payment Bond states that it applies to "all just claims for labor performed and materials and supplies furnished upon or for the work under the [DBC], whether said labor be performed and said

---

[9] The Court has confirmed that based on the representations in the parties' Amended Joint Jurisdictional Statement, it can exercise diversity jurisdiction over this action. [Filing No. 28.] Given the application of Indiana law, the Co-Sureties' Supplemental Authority in Support of their Motion for Summary Judgment, which directed the Court to a case recently decided by an intermediate appellate court in Pennsylvania, is not persuasive. [Filing No. 72.]

materials and supplies be furnished under the original [DBC], *any subcontract*, or any and all duly authorized modifications thereto." [Filing No. 33 at 18-19 (citing Filing No. 33-5 at 1) (emphasis added).] Aztec-TYPSA points out that there is no design exclusion in the Payment Bond, and it asks the Court to enter summary judgment in its favor on its claim against the Co-Sureties. [Filing No. 33 at 18-21.]

In response, the Co-Sureties contend that they are entitled to summary judgment because the Payment Bond does not cover design services encompassed by the DBC and only covers "just claims for labor performed" under the DBC. [Filing No. 48 at 25; Filing No. 48 at 33-38.] The Co-Sureties argue that design services are not "labor" because the Payment Bond must be interpreted in light of the surrounding circumstances and Indiana does not require payment bond coverage for the design portion of public design-build construction projects. [Filing No. 48 at 26.] The Co-Sureties emphasize that the statute referenced in the PPA "does not require design-build contractors to provide payment bond coverage for the part of a public-private agreement that includes design. In fact, Article [15.5[10]] of Title 8 of the Indiana Code does not require design-build contractors to provide any payment bond coverage whatsoever." [Filing No. 48 at 27 (citing Indiana Code Article § 8-15.5).] The Co-Sureties ask the Court to apply the "strict terms" of the contracts at issue, and they cite case law that they argue confirms Indiana's recognition of "the distinction between design services and labor." [Filing No. 48 at 28-30; Filing No. 48 at 36-38.]

In its reply brief, Aztec-TYPSA emphasizes that the Payment Bond does not exclude design work, that it incorporates the DBC, and that the DBC covers design work. [Filing No. 50 at 23-24.] Aztec-TYPSA points out that Isolux-Corsán's total bid amount for the DBC—including

---

[10] While the Co-Sureties' brief references Article 15.7, [Filing No. 48 at 27], they confirm in their reply brief that they meant to reference Article 15.5 and instead made a scrivener's error, [Filing No. 53 at 17].

costs for design and engineering services—was $307,000,000 and that the Payment Bond was issued for 5% of that total amount pursuant to the PPA and the DBC. [Filing No. 50 at 26.] It argues that this confirms the Co-Sureties' intent to cover design work. [Filing No. 50 at 26-27.] Aztec-TYPSA rejects the Co-Sureties' interpretation of the word "labor" in the Payment Bond to exclude design services, pointing out that most of the cited statutes and case law are inapplicable. [Filing No. 50 at 28.] Aztec-TYPSA urges the Court to construe the unambiguous language at issue in the PPA, DBC, and the Payment Bond to include coverage for Aztec-TYPSA's design work, pointing out that the PPA only references Indiana Code 8-15.5 and that Article places no restrictions on the scope of bond coverage. [Filing No. 50 at 29-33.]

In its final brief, the Co-Sureties emphasize that the Payment Bond is not an insurance policy and that "a surety does not automatically become liable for all of its principal's debts to subcontractors by issuing a payment bond." [Filing No. 53 at 3-4.] They contend that the Payment Bond must be strictly construed and that the Court cannot add terms and conditions to extend coverage. [Filing No. 53 at 4-5.] The Co-Sureties rely on the Payment Bond's use of the term "labor," which they argue excludes design work, [Filing No. 53 at 6-7], and they reject Aztec-TYPSA's reliance on the broad definition of the term "Work" in the PPA, [Filing No. 53 at 11-14]. They conclude that neither the PPA nor the DBC required payment bond coverage for design work and that, instead, they only required coverage for the portion of D&C Work based on a portion of the Indiana Code "that does not require or even contemplate coverage for design/engineering services." [Filing No. 53 at 14-16 (citing Indiana Code 8-23-9, *et seq.*).] Finally, although the Co-Sureties concede that "Indiana has adopted a policy of requiring surety protection for certain services that are provided in the actual construction of public projects," they

deny that it extends to "any services that do not relate to actual construction." [Filing No. 53 at 16.]

Under applicable Indiana law, "a surety contract obligates the surety to answer for the debt, default, or miscarriage of another." *BMD Contractors, Inc. v. Fid. & Deposit Co. of Maryland*, 679 F.3d 643, 653 (7th Cir. 2012) (citation omitted). Surety contracts are not bilateral; instead, they "create a tripartite relation between the party secured, the principal obligor, and the party secondarily liable, and the rights, remedies, and defenses of a surety cannot be disassociated from this relationship." *Id.* Indiana surety law is "quite clear on two general points: (1) sureties are generally liable only where the principal itself is liable; and (2) concurrently executed bonds and the contracts they secure are construed together." *Id.* at 654.

Surety contracts are interpreted using general contract standards. *See id.* at 653-54. Interpretation of a written contract is typically a question of law for which summary judgment is particularly appropriate. *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 270 F.3d 1117, 1123 (7th Cir. 2001); *Tri-Central High Sch. v. Mason*, 738 N.E.2d 341, 344 (Ind. Ct. App. 2000). The goal of contract interpretation is to ascertain and give effect to the parties' intent, as reasonably manifested by the language of the agreement. *Reuille v. E.E. Brandenberger Const., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). The Court is required to "consider a contract's provisions together and in a way that harmonizes them." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 644-45 (7th Cir. 2016) (citing Indiana law). Other contracts that are referred to in the contract being interpreted "may be regarded as incorporated by the reference as a part of the contract and, therefore, may properly be considered in the construction of the contract." *Id.* at 644. This principle also applies to statutes and regulations referenced in a contract. *Id.*

"Indiana follows 'the four corners rule' that extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction." *Univ. of S. Indiana Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006). "Clear and unambiguous terms in the contract are deemed conclusive, and when they are present [the Court] will not construe the contract or look to extrinsic evidence, but will merely apply the contractual provisions." *Ryan v. Ryan*, 972 N.E.2d 359, 364 (Ind. 2012). An ambiguity does not arise simply because the parties disagree on the interpretation; instead, "language is ambiguous only if reasonable people could come to different conclusions about its meaning." *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008) (citing *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distrib., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005)).

The Payment Bond is a short contract that expressly incorporates the DBC and characterizes the DBC as "related to the performance of *design* and construction work for the Project." [Filing No. 33-5 at 1 (emphasis added).] The DBC includes a payment security provision titled "Design and Construction Security Requirements," [Filing No. 33-4 at 15], that required Isolux-Corsán to obtain and maintain a payment bond "required under Section 17.2.1 of the PPA securing Developer's obligations under the PPA, in the same amounts and forms and having the same terms required for the Payment Bond and Performance Security required of Developer by Section 17.2.1 of the PPA . . . ." [Filing No. 33-4 at 15.] Section 17.2.1 of the PPA is also titled "Design and Construction Security Requirements," [Filing No. 33-3 at 28], and provides as follows:

### 17.2 Payment and Performance Security

#### 17.2.1 Design and Construction Security Requirements

17.2.1.1 As a further condition precedent to commencement of any Construction Work, Developer shall have obtained, delivered to IFA and maintain a separate Payment Bond in an amount equal to five percent (5%) of the Total Project Capital Cost with respect to Construction Work and separate Performance Security in an amount equal to twenty-five percent (25%) of the Total Project Capital Cost, as are required prior to issuance of NTP2 pursuant to Section 5.6.1.1.

[Filing No. 33-3 at 28.]  There is no dispute that Section 17.2.1 of the PPA governed the required Payment Bond for the Project.  [Filing No. 53 at 11 (Co-Sureties' reply brief confirming no dispute on this point).]

The Co-Sureties argue that the language of the PPA's security requirement provision only covers "Construction Work," [Filing No. 48 at 8-9], but that argument directly contradicts the unambiguous title of the PPA's security provision, which also references "Design."  [Filing No. 33-3 at 28.]  Additionally, Section 17.2 links the amount of the required payment bond to the "Total Project Capital Cost," and the PPA's definition of that term states that "[f]or purposes of Section 17.2 of the [PPA], the term 'Total Project Capital Cost' includes costs associated with . . . D&C Work . . . ."  [Filing No. 50-4 at 72.]  The PPA defines "D&C Work" as "Design Work and Construction Work . . . ."  [Filing No. 50-4 at 18.]  Based on these definitions and incorporations, the PPA's security requirement was tied to the total amount of Design Work and Construction Work.  The Court finds that this language unambiguously confirms the parties' intent that the required payment bond cover both Design Work and Construction Work.

Alternatively, even if the Court accepts the Co-Sureties' argument that the PPA's security requirement only covers the Project "with respect to Construction Work," [Filing No. 33-3 at 28], the PPA defines "Construction Work" as "all *Work* to build or construct, reconstruct, rehabilitate, make, form, manufacture, furnish, install, integrate, supply, deliver or equip the Project . . . ,"

[Filing No. 50-4 at 16 (emphasis added)]. The PPA defines the term "Work" to include, among other things, "design." [Filing No. 50-4 at 75.] The "Abbreviations and Definitions" section of the PPA states that "[u]nless otherwise specified, whenever the following abbreviations or terms are used in the [PPA] and the Technical Provisions, they have the meanings set forth below." [Filing No. 33-3 at 30.] Because "Work" is a defined term referenced within the definition of "Construction Work" and the definition of "Work" includes "design," the Court concludes that the term "Construction Work" as used in the security provision of the PPA also includes "design."[11]

To support their argument, the Co-Sureties heavily rely on various portions of the Indiana Code that they contend confirm that payment bonds for public-private agreements do not cover design services. [Filing No. 48 at 25-33 (citing Indiana Code §§ 5-30-1-2, 5-30-1-7, 5-30-3-2, 5-30-8-4, 8-15.7-1-5, and 8-23-9, *et seq.*).] But the PPA specifies that Indiana Code Article 8-15.5 is the applicable statutory authority on which the PPA relies as a public-private agreement. [Filing No. 33-3 at 15.] The Co-Sureties contend that Indiana Code Article 8-15.5 "does not require design-build contractors to provide payment bond coverage for the part of a public-private agreement that includes design." [Filing No. 48 at 27.] The Co-Sureties' argument suggests that the lack of a statutory requirement for payment bond coverage for design services means that such

_____

[11] The Court rejects the Co-Sureties' argument that this construction of the contract renders the PPA's separate definitions of various subcategories of work meaningless. [Filing No. 53 at 12-13.] The term "Work" is a defined term in the PPA that is specifically referenced in the definition of "Construction Work." [Filing No. 50-4 at 16; Filing No. 50-4 at 75.] Unlike the term "Construction Work," the majority of the subcategories on which the Co-Sureties rely to make their argument do not reference "Work" in their definitions. [*See* Filing No. 53 at 12-13 (relying on "Aesthetics and Landscaping Work," "Karst Feature Treatment Work," "O&M Work," "Railroad Force Account Work," and "Rehabilitation Work" to make their argument, but none of those subcategories reference "Work" in their definitions).] Accordingly, the Court rejects the Co-Sureties' argument that construing the term "Construction Work" to incorporate "design" for purposes of the PPA's security requirement renders other subcategories of work defined in the PPA meaningless.

coverage would be prohibited under a public-private agreement. But that position ignores the well-established principle that "Indiana courts zealously defend the freedom to contract," *Indiana v. Int'l Bus. Machines Corp.*, 51 N.E.3d 150, 160 (Ind. 2016), and that the Indiana Supreme Court has confirmed that courts "must leave to the individual parties the right to make the terms of their agreements as they deem fit and proper, and, as long as those terms are clear and unambiguous and are not unlawful, [courts] can only enforce them as agreed upon[,]" *New Welton Homes v. Eckman*, 830 N.E.2d 32, 35 (Ind. 2005). The Co-Sureties do not argue that any exception to this general rule applies,[12] and, in fact, their reply brief confirms that

> [t]o the extent Indiana's public policy is relevant, Indiana's legislature has signaled a policy of either not requiring and/or expressly excluding payment bond protection for services that are unrelated to the actual construction of a public project. In reality, while Indiana has adopted a policy of favoring/requiring payment bond protection for labor/material/services provided in the actual construction of public project[s], no such policy exists relative to design/engineering services on public projects.

[Filing No. 53 at 3.] While Indiana may not have a statutorily confirmed policy favoring payment bond protection for design services on public-private agreements, it cannot be said that Indiana

---

[12] Under Indiana law, the Court may refuse to enforce a contract "that (1) contravenes a statute, (2) clearly tends to injure the public in some way, or (3) is otherwise contrary to the declared public policy of [Indiana]." *WellPoint, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 N.E.3d 716, 724 (Ind. 2015).

has prohibited parties from contracting for such protection.[13]

      The Co-Sureties argue that the Payment Bond itself excludes coverage for design services because it covers "all just claims for labor performed," and Aztec-TYPSA's design services were allegedly not "labor." [Filing No. 48 at 32-38.] As an initial matter, the Co-Sureties' quotation ignores the language following the portion they cite, which states that the Payment Bond covers "all just claims for labor performed and materials and supplies furnished upon *or for the work* under the [DBC]" regardless of whether it was performed "under the original [DBC], *any subcontract*, or any and all authorized modifications thereto . . . ." [Filing No. 33-5 at 1 (emphases added).] It is beyond dispute that Aztec-TYPSA's design services were work performed pursuant to the ESA, which is a subcontract of the DBC. But even if the Payment Bond only covered "labor," as the Co-Sureties contend, Aztec-TYPSA's services were "labor" within the scope of that contract. The word "labor" is not defined in the Payment Bond, [Filing No. 33-5], or in the DBC, which is the contract expressly incorporated into the Payment Bond, [*see* Filing No. 50-5 at 10-11 (portion of DBC where "labor" would be defined)]. When terms are not defined, Indiana courts apply the "plain and ordinary meaning" of contract language "and enforce the contract according to those terms." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012); *see*

---

[13] Despite conceding that the PPA's security provision governs the required payment bond for the Project, [Filing No. 53 at 11], the Co-Sureties frequently cite a portion of the DBC's security provision providing that "[t]he requirements of Section 17.2.1 of the PPA shall apply to new, reconstructed or rehabilitated improvements during the Term, and any other D&C Work [Isolux-Corsán] performs for which a bond is required under IC 8-23-9[,]" [Filing No. 48 at 29-32 (citing Filing No. 33-4 at 15)]. The Co-Sureties emphasize that this portion of the Indiana Code does not require any payment bond coverage for design services. [Filing No. 48 at 29-32.] While that may be true, it also does not prevent parties from contracting to provide payment bond coverage for design services, as they did here. Additionally, the Court notes that while the Co-Sureties cite "Section 17.2.1.11" of the PPA to support their argument, [Filing No. 48 at 29], that provision was not included in the portions of the PPA designated on summary judgment, [Filing No. 33-3; Filing No. 47-1 at 18-21; Filing No. 50-4], and cannot be considered.

*also Sans v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1101 (Ind. Ct. App. 1997) (emphasizing that "there is no rule of construction that every term in an insurance contract must be defined, and the mere fact that a term is not defined does not render it ambiguous"). The Court agrees with Aztec-TYPSA that the common meaning of the word "labor" includes human activity that provides services. [Filing No. 50 at 28 (citing Merriam Webster Online Dictionary, *available at* www.merriam-webster.com/dictionary/labor) ("human activity that provides the goods or services in an economy").] In the context of the Payment Bond, the plain and ordinary meaning of the word "labor" encompasses design services, as evidenced by the fact that the Payment Bond repeatedly recognizes that the contracts at issue relate to, among other things, the "design" of the Project. [Filing No. 33-5 at 1.]

The Indiana Supreme Court has emphasized that the goal of contract interpretation is to ascertain and give effect to the parties' intent, as reasonably manifested by the language of the agreement. *Reuille*, 888 N.E.2d at 771. For the reasons stated herein, the Court concludes that the unambiguous language of the Payment Bond, the PPA, and the DBC confirm that the parties contracted for the Payment Bond to cover design work on the Project furnished under the DBC or any subcontract of the DBC.

**B. Isolux-Corsán's Possible Claims and Defenses against Aztec-TYPSA**

The Co-Sureties argue that even if the Court concludes that the Payment Bond covers design services, genuine issues of material fact preclude summary judgment in Aztec-TYPSA's favor based on defenses, offsets, set-offs, and counterclaims that Isolux-Corsán may have against

Aztec-TYPSA under the ESA or the Team Member Agreement ("TMA").[14]  [Filing No. 48 at 39-47.]  The Co-Sureties emphasize that under Indiana law, they stand in the shoes of Isolux-Corsán and that "the Co-Sureties cannot face any liability to the Plaintiffs unless [Isolux-Corsán] actually owes something to [Aztec-TYPSA] after those defenses, offsets, set-offs, counterclaims, etc. are considered."  [Filing No. 48 at 40.]  The Co-Sureties designate evidence that Isolux-Corsán believes that Aztec-TYPSA's performance under the TMA and ESA was deficient, contained numerous errors and omissions, and resulted in at least $10,000,000 of damages to Isolux-Corsán.  [Filing No. 47-1 at 1-16.]  Consequently, the Co-Sureties ask the Court to find that genuine issues of material fact on Isolux-Corsán's possible recovery against Aztec-TYPSA pursuant to claims Isolux-Corsán may have under the ESA and the TMA preclude summary judgment in this action.  [Filing No. 48 at 46-47.]

In response, Aztec-TYPSA disputes that the Co-Sureties can rely on any set-off rights that Isolux-Corsán may have under the TMA because Indiana common law requires that the debt be ascertained and the Co-Sureties make the "fatal admission . . . that the TMA-related claims are nothing more than 'unrelated debts [Aztec-TYPSA] *may owe*.'"  [Filing No. 50 at 12-13 (citing Filing No. 48 at 43) (emphasis added).]  Aztec-TYPSA also points out that the TMA has an Arizona forum selection clause and that Isolux-Corsán has never sued it—in Indiana, Arizona, or elsewhere—to recover on any claims it may have under the TMA.  [Filing No. 50 at 11-18.]  With regard to the Co-Sureties' attempt to rely on the offset provision in the ESA, Aztec-TYPSA

---

[14] Aztec-TYPSA and Isolux-Corsán entered into the TMA in August 2013, approximately one year before they entered into the ESA.  [Filing No. 47-2 at 6-9 (the TMA).]  The Court need not address the details of the TMA because, for the reasons stated below, the Co-Sureties cannot rely on the set-off for any potential claims Isolux-Corsán may have against Aztec-TYPSA pursuant to the TMA.  Underscoring this point is Isolux-Corsán's concession in its unsuccessful bid to intervene in this action that this litigation is not the appropriate forum to assert any claims under the TMA.  [Filing No. 45 at 16; Filing No. 57 at 5.]

emphasizes that even if Isolux-Corsán has claims that could offset what Aztec-TYPSA is owed, those claims have not been reduced to judgment because Isolux-Corsán never pursued arbitration. [Filing No. 50 at 18-21.] Aztec-TYPSA concludes that any potential factual dispute regarding the claims Isolux-Corsán may have against Aztec-TYPSA does not prevent summary judgment in favor of Aztec-TYPSA because "the [Co-]Sureties are not able to assert those allegations, if they were factually valid, as defenses in this lawsuit at all." [Filing No. 50 at 4.]

In their reply brief, the Co-Sureties do not reassert their arguments regarding potential defenses, offsets, set-offs, and counterclaims that Isolux-Corsán may have against Aztec-TYPSA under the ESA or the TMA. [Filing No. 53.] They also do not respond to Aztec-TYPSA's arguments on this issue. [Filing No. 53.] The Court will not develop reply arguments for the Co-Sureties and, instead, construes their silence as a waiver of any challenge to factual contentions regarding Isolux-Corsán's failure to pursue relief against Aztec-TYPSA for alleged deficiencies in its work. *See Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 673 (7th Cir. 1998) (emphasizing that silence in a reply brief does not constitute waiver of the legal issue but "does constitute a waiver of the specific factual contentions made by the opposing party in a brief filed earlier").

The Court agrees with the Co-Sureties that they cannot be liable in this Payment Bond action to the extent that Isolux-Corsán itself is not liable to Aztec-TYPSA. That is a well-established principle of surety law in Indiana. *See BMD Contractors*, 679 F.3d at 654 (emphasizing that Indiana surety law is "quite clear [that] sureties are generally liable only where the principal itself is liable"). The problem with the Co-Sureties' attempt to invoke the ESA's offset provision as a defense in this action is that the provision on which the Co-Sureties rely for Isolux-Corsán's offset rights clearly states that Isolux-Corsán "may deduct and offset any damages *owing to it* under the DBC Documents or this [ESA] . . . ." [Filing No. 33-6 at 75 (ESA ¶ 19.2.5.5)

(emphasis added); Filing No. 48 at 44 (Co-Sureties' brief citing that section for Isolux-Corsán's offset rights).] The Co-Sureties' argument erroneously assumes that the word "owing" in that provision includes damages that Aztec-TYPSA could someday owe Isolux-Corsán if Isolux-Corsán pursued arbitration. But the plain and ordinary meaning of the word "owing" is "due to be paid." Merriam-Webster Online Dictionary, *available at* www.merriam-webster.com/dictionary/owing. The Co-Sureties designate no evidence that Isolux-Corsán is due to be paid anything from Aztec-TYPSA at this time, and they cannot designate such evidence because Isolux-Corsán has not pursued arbitration against Aztec-TYPSA on the claims it timely disputed, such that Isolux-Corsán has "damages owing to it" from Aztec-TYPSA that can trigger the ESA's offset provision.[15] [Filing No. 33-6 at 75.] Accordingly, the Co-Sureties cannot rely on the offset provision of the ESA to reduce the amount of Aztec-TYPSA's claim against the Payment Bond for Isolux-Corsán's non-payment at issue in this litigation.

Indiana common law set-off rights for damages Isolux-Corsán may be able to recover for Aztec-TYPSA's alleged breach of the TMA also fails. Even setting aside that the TMA contains an Arizona choice-of-law provision and that Isolux-Corsán previously conceded that this litigation is not the appropriate forum in which to assert claims related to the TMA, [Filing No. 45 at 16; Filing No. 57 at 5], applicable law precludes the Co-Sureties' set-off request. Indiana recognizes "the right that exists between two persons, each of whom under an independent contract, express or implied, owes *an ascertained amount* to the other, to set off their mutual debt by way of

---

[15] Isolux-Corsán sent Aztec-TYPSA a letter on May 20, 2016 invoking the dispute resolution proceedings pursuant to the ESA and stating that it would pursue arbitration if an agreement was not reached. [Filing No. 47-1 at 12-14 (letter from Isolux-Corsán to Aztec-TYPSA titled "Notice of Invocation of Dispute Resolution Procedures" and concluding that "[i]f Isolux and Aztec-TYPSA cannot reach an agreement by the conclusion of that ten business day period, Isolux will commence arbitration proceedings").] Isolux-Corsán never initiated arbitration against Aztec-TYPSA as required by the ESA's dispute resolution provision. [Filing No. 50-1 at 2 (affidavit).]

deduction." *Benjamin v. Benjamin*, 849 N.E.2d 719, 725 (Ind. Ct. App. 2006) (emphasis added) (citation omitted); *see also Am. Mgmt., Inc. v. MIF Realty, L.P.*, 666 N.E.2d 424, 432 (Ind. Ct. App. 1996) ("a set-off exists between two persons, each of whom under an independent contract, express or implied, owes an ascertained amount to the other . . . . In other words, the set-off amount must be subtracted from the total amount of the larger debt."). But in the case at bar, the Co-Sureties concede that any amount Aztec-TYPSA may owe Isolux-Corsán for an alleged breach of the TMA has not been ascertained. [*See* Filing No. 48 at 43 ("Isolux also possesses a common law right to set-off any unrelated debts [Aztec-TYPSA] *may owe*—such as those arising from the Plaintiffs' breach of the TMA") (emphasis added).] This is because Isolux-Corsán has never initiated litigation against Aztec-TYPSA—in Indiana, Arizona, or elsewhere—for any alleged breaches of the TMA. [Filing No. 50-1 at 3.] Accordingly, the Court concludes that the Co-Sureties cannot rely on a hypothetical, unascertained debt that Aztec-TYPSA may owe Isolux-Corsán because of its alleged breach of the TMA to invoke a common law right to set-off at this time.

The Co-Sureties' attempt to invoke the principles of offset and set-off as defenses in this action ring hollow. Other than generally referencing the future possibility of those claims to try to avoid paying Aztec-TYPSA's Payment Bond claim, neither Isolux-Corsán nor the Co-Sureties have done anything to pursue legal action for Aztec-TYPSA's alleged breaches of the TMA or the ESA. [Filing No. 50-1 at 2-3.] In fact, the Co-Sureties confirm in a proposed amended answer that "[t]he Co-Sureties do not independently possess and are not independently asserting any affirmative counterclaims for damages against the Plaintiffs, and the Co-Sureties do not contend that they are entitled to recover any sums/damages from the Plaintiffs at this time." [Filing No. 59-1 at 17]. The Court would have expected the Co-Sureties or Isolux-Corsán (or both) to take

affirmative steps to pursue claims against Aztec-TYPSA for its alleged breaches of the ESA and the TMA if their belief in the availability of set-off or offset were sincere. The Co-Sureties' defensive attempt to rely on the potential existence of such claims without actually pursuing them, however, cannot defeat Aztec-TYPSA's request for summary judgment under the Payment Bond for unpaid, undisputed amounts.[16]

### C. Effect of Court's Rulings

For the reasons set forth in the previous sections, the Court concludes that the parties to the PPA, the DBC, and the Payment Bond contracted for bond coverage that included design services on the Project that were furnished under the DBC or any subcontract. It is undisputed that Aztec-TYPSA performed design services on the Project pursuant to the ESA, which was a subcontract of the DBC. Thus, Aztec-TYPSA's design services were covered by the Payment Bond if Isolux-Corsán failed to "pay, as they become due, all just claims . . . ." [Filing No. 33-5 at 1.] It is undisputed that Isolux-Corsán failed to pay certain claims Aztec-TYPSA made on Applications for Payment after they became due, and that Isolux-Corsán also did not dispute those claims pursuant to the procedure set forth in the ESA. [*See* Filing No. 30 at 8-9; Filing No. 33-1 at 3-7.] Accordingly, Aztec-TYPSA is entitled to summary judgment as a matter of law on its claim against the Co-Sureties for payment under the Payment Bond. This resolves all pending claims in this litigation.

Typically when the Court enters summary judgment in favor of a plaintiff, it will request briefing or hold a hearing to determine the amount of damages to award. In this case, however, the amount of damages is not in dispute. Aztec-TYPSA designated evidence to support its request

---

[16] Accordingly, Aztec-TYPSA's Motion to Strike Allegations and Affirmative Defenses in the Co-Sureties' Answer, [Filing No. 49], and the Co-Sureties' Motion for Leave to File an Amended Answer, [Filing No. 59], are both denied.

that the Court enter summary judgment in its favor and award it $4,678,451.61 plus prejudgment interest for the amount of claims that Isolux-Corsán did not pay and did not dispute pursuant to the procedure set forth in the ESA. [Filing No. 32 at 2 (summary judgment request for that amount); Filing No. 33-1 at 6 (affidavit stating that "the undisputed amount owed now totals $4,678,451.61") (citing Filing No. 33-10 ("Summary of Undisputed Corsan Overdue Invoices")).] Although the Co-Sureties criticize Aztec-TYPSA for not submitting the actual invoices upon which that amount is based, [Filing No. 48 at 23], the Co-Sureties do not dispute the amount or designate any contrary evidence. Summary judgment is the moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson*, 325 F.3d at 901. Because the Co-Sureties did not offer contradictory evidence in response to Aztec-TYPSA's damages evidence, the amount that Isolux-Corsán failed to pay Aztec-TYPSA for its design services and did not dispute pursuant to the procedure set forth in the ESA is not in question. *See Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 795 (7th Cir. 2014) ("Northern introduced no evidence whatsoever to contradict Hanover's [monetary] figure. There is no issue of fact, here, let alone a genuine issue."). Accordingly, the Court concludes that Aztec-TYPSA is entitled to summary judgment in its favor and an award of $4,678,451.61 plus prejudgment interest. [*See* Filing No. 1 at 10 (requesting prejudgment interest with any damages award).] Final judgment shall enter accordingly.

## IV.
### CONCLUSION

Aztec-TYPSA's Motion for Leave to File Amended Exhibits is **GRANTED IN PART** such that Filing No. 50-3 is **STRICKEN** and **DENIED IN PART** such that the belatedly submitted exhibit filed with that motion, [Filing No. 54-3], will not be considered. [Filing No. 54.] For the reasons stated herein, the Court **GRANTS** Aztec-TYPSA's Motion for Summary

Judgment, [Filing No. 32], and **DENIES** the Co-Sureties' Motion for Summary Judgment, [Filing No. 47].  The Court **DENIES** Aztec-TYPSA's Motion to Strike Allegations and Affirmative Defenses in the Co-Sureties' Answer, [Filing No. 49], as well as the Co-Sureties' Motion for Leave to File an Amended Answer, [Filing No. 59].  Final judgment in favor of Aztec-TYPSA in the amount of $4,678,451.61 plus prejudgment interest shall enter accordingly.

Date:  April 18, 2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Electronic Distribution via CM/ECF:**

J. Michael Cavosie
EASTER & CAVOSIE
mcavosie@easterandcavosie.com

Jarrod W. Stone
MANIER & HEROD PC
jstone@manierherod.com

John M. Gillum
MANIER & HEROD PC
jgillum@manierherod.com

Charles E. Harper
QUARLES & BRADY LLP
charles.harper@quarles.com

Hunter Gerard DeKoninck
QUARLES & BRADY LLP (Indianapolis)
hunter.dekoninck@quarles.com

Michael A. Rogers
QUARLES & BRADY LLP (Indianapolis)
michael.rogers@quarles.com